SOMERSET.

A vote for a candidate who is constitutionally ineligible is not to be counted.

Upon a question of fact, arising at an election, which the selectmen, in the course of their duty, as presiding officers, are bound to determine, their decision is presumed to have been right, until the contrary is clearly proved.

Where it clearly appears, that a voter deposited a vote for one person, by mistake, intending to vote, and supposing that he did vote, for another, it seems that his vote is not to be counted.

It is the duty of every town to provide itself with proper ballot-boxes.

THE petition of William W. Moore and others, against the election of the member returned from the town of Somerset, was presented[2] to the house on the 4th of January, and was referred[3] the next day to the committee on elections. On the thirtieth of March the committee reported[4] as follows :—

"The petition contains four objections to Mr. Slade's election :—

1st. That the name of Nathaniel Morton was borne on one

[1] 71 J. H. 236.    [2] Same, 10.    [3] Same, 16.    [4] Same, 537.

of the ballots for representative, cast by a legal voter of Somerset, which was disregarded by the selectmen, and not included in the whole number of votes declared by the selectmen on that occasion.

2d. That, in the election, John Pike, a person not legally qualified as a voter, put into the box a ballot for Slade, which was counted and included, by the selectmen, in the ninety-four votes for Slade.

3d. That Robert Gibbs, or some other person, during the election, put into the box two ballots, each having thereon the name of Slade, which ballots were counted by the selectmen, and included in the ninety-four votes for Slade.

Finally. That Slade did not receive a majority of the votes legally cast in the election by the qualified voters therein.

The committee, before considering these allegations, feel it to be their duty to state to the house, that, although the proceedings of the meeting were not so far irregular as to make it proper, on that account, to set aside the election, yet, the proceedings were very disorderly; that the election being for state officers and member of congress, the votes were received into three hats, a practice, in itself very reprehensible, inasmuch as every town ought to be provided with suitable ballot-boxes; that great confusion prevailed in the meeting; that the bystanders crowded in a disorderly manner around the desk where the votes were received; and that it was proved, in two instances, at least, that persons, not town officers, presumed to meddle with the hats, and to touch the ballots, before the vote was finally declared.

Such practices the committee conceive to be very unbecoming and disreputable, and deserving the rebuke of this house.

At the hearing of the case, the town records were produced, by which the following appeared to be the statement of votes, at the election on the 13th day of November last, for town representative, viz.:—Whole number of votes, 186; for Jona. Slade, 2d, 94; John A. Burgess, 86; Benjamin Cartwright, 2; Daniel Chase, 3; Geo. S. Hood, 1.

It also appeared, by the testimony in the case, that there

73

was found in the hat, with the votes for town representative, one printed piece of paper, bearing on it the following words: 'For representative to congress, Nathl. Morton, of Taunton,' which piece of paper the selectmen disregarded and rejected, and did not count as a ballot, in reckoning up the whole number of votes. As to this vote, it was testified to by two witnesses, that it was put into the hat by Jona. Buffington, Jr., a qualified voter. The witnesses, Charles W. Moore, and John W. Marble, swore that they saw the vote in Buffington's hand, saw him put it into the hat, and saw it afterwards in the hat.

The said Jona. Buffington was also produced before the committee, and swore that a Mr. Bowers called on him, at the place where he was, two miles from the place of voting, and requested him to go to town-meeting and vote for representative; that he gave him a vote for Jona. Slade, 2d, as he supposed, which he put into the box pointed out by the selectmen; but he said he did not look at the vote, and did not see what name was on it; that he intended to vote for Mr. Slade, and didn't know that he did not vote for him. Other testimony was introduced, to show that Mr. Bowers, who went after Buffington, was a friend of Slade's, and procured the attendance of Buffington, to vote for Slade.

The committee, on this evidence, were of opinion, that said piece of paper, so found in the hat, with the name of Nathl. Morton upon it, was rightly rejected by the selectmen, for these reasons:—

1st. Because it clearly appeared, that said vote was cast by the said Buffington, by mistake, he fully intending to vote, not for Morton, but for Slade, and believing that he had done so.

2d. Because the vote was for a person not eligible for the office balloted for, as appeared by inspection of the vote itself.

The committee believe this question to have been settled by the decision of the house, in the case of the town of Whately,[1] in 1843; but, as that decision is, perhaps, of doubtful authority, having been made at a time of much party excitement, and, as

[1] Ante, 439.

it seems desirable that a question so important should be finally settled, they venture to suggest a few reasons in favor of rejecting votes given for ineligible candidates, at elections for representatives.

In the first place. It is to be presumed that such votes are cast by mistake, as whenever the names of the persons giving such votes have been ascertained, it has generally been found that their votes were cast inadvertently.

Again. The policy of the law requires, that such a construction should be put upon all proceedings at elections, as to make such proceedings valid, rather than nugatory. An election is always attended with trouble, inconvenience, and expense, and should not be set aside for light or frivolous causes. If votes cast by mistake, for persons not eligible, are to be counted, then the intention and will of the voter is defeated; if, on the other hand, such votes are wilfully put into the ballot-box, the person who thus votes indicates so clearly his disregard of the value of the elective franchise, that it is only a deserved punishment for his delinquency, to deprive his vote of all weight and influence at such election. By so doing, a voter is not deprived of any legitimate exercise of his right, because he can always manifest his opposition to any one candidate, by voting for some other.[1]

Finally, it seems to the committee, that there is no reason why a person, who votes for an ineligible candidate, should not be put upon the same footing with one who does not vote at all, as, in both cases, the parties show a disposition to prevent an election, and both of them show an unwillingness to perform their duty by aiding to promote those elections, which are absolutely essential to the existence of the government. For, if every voter refrained wholly from voting, or voted for an ineligible candidate, the result would be the same—no choice; and, although it is true that no penalty is attached, by law, to a neglect of this obligation of voting, yet the obligation is not the less plain for that, and the committee believe it

---

[1] In the case of *The King* v. *Monday*, Cowper, 537, Lord Mansfield said, that the only way of voting against one candidate was to vote for another.

to be a duty too important to be neglected, and too sacred to be trifled with, by voting for fictitious persons, or ineligible candidates. It may be urged, that, since the Revised Statutes provide, that blank pieces of paper shall not be counted as votes, the absence of any provision, to reject votes for ineligible candidates, is a strong argument that the legislature did not intend that they should be so rejected; the committee, however, believe, that it was not, at that time, contemplated, that any provision could be necessary, it being supposed that the practice of rejecting such votes by the legislature was so uniform, as to have taken the place of a law. Otherwise, it is difficult to see, why the same section was not made to comprehend both cases.

The voter, who puts into the ballot-box a blank piece of paper, as clearly indicates his opposition to all the candidates, as he who puts in a vote for an ineligible candidate; and there seems to be no reason, why the opinion of the one should not be entitled to consideration as well as that of the other.

As to the second allegation contained in the petition, that the vote of John Pike should have been rejected by the selectmen, at the election, it was proved to the satisfaction of the committee, that Pike was not qualified to vote at the election, he not having paid any tax assessed upon him within two years of the time of said election. It was also proved, that Pike voted for Jonathan Slade, 2d. They therefore are of opinion, that the vote of Pike should have been rejected by the selectmen, and that the same should not have been reckoned among the whole number of votes given in at the election.

As to the third allegation, that Robert Gibbs, or some other person, during said election, put into the ballot-box two ballots, having each thereon the name of said Slade, the committee find, that the history of the occurrence, out of which this allegation originated, is, in substance, as follows:—the votes for representative were received in a hat; from thence for the purpose of counting them, they were turned out upon the table. One of the selectmen assorted them, laid them in a pile by the side of the presiding officer, who took them up, read off

the names, and then returned each vote to the hat; in the mean time the town clerk kept tally. While the counting was going on, a bystander touched two votes which adhered together, and turned them on the rim of the hat, at the same time, exclaiming, 'Here are two votes which you have counted only as one.' The presiding officer thereupon took the two votes, which were both for Jonathan Slade, 2d, and laid them aside, at the same time remarking, that he would let them lie there until they had finished the count, as perhaps there might be a choice without recounting.

There was no choice, however, without enumerating both these votes, and the selectmen proceeded to recount, when the result, with these two votes included, was as above stated. On the part of the petitioners, it was urged, that these two votes must have been put into the hat accidentally, or otherwise, by one and the same person, because, as they said, it was almost impossible, that two votes should have got together, and coincided exactly, as was sworn to be the fact, unless they had been originally deposited by the same person. It was testified, on the other side, by the selectman who counted the votes, that these votes were on printed paper, 'a little dampish,' and that he 'laid them snug together in a pile.'

The committee had some difficulty in determining this question, but they finally concluded, that, inasmuch as said votes were not folded or fastened together, it was not impossible that they might have got together, while they were thus assorted and piled up, and adhered together afterwards, and that they were bound to presume, that said votes were deposited in the hat by two different persons. Furthermore, the committee felt bound to confirm the decision of the selectmen, in this matter, there being no direct testimony to impeach that decision. These officers, having been intrusted with the duty of presiding at the election, are to be presumed to have acted fairly and honestly, in the performance of that duty, until the contrary is shown. With both these votes, and all the facts before them, they decided, that what was denominated a double vote was, in fact, two distinct ballots. In the absence, then,

of any direct testimony, such as would be that of the person who put the votes in, or of some person who actually saw them put in, the committee do not feel justified in reversing that decision. Their opinion is, therefore, that the petitioners have failed to prove the allegation, that two votes were cast at said election by one person.

It follows from the above, that the final allegation contained in the petition, that Slade did not receive a majority of the votes legally cast in said election by the qualified voters therein, is not, in the opinion of the committee, sustained.

Correcting the statement of votes, agreeably to the above conclusions, and rejecting the vote of said Pike, the return would be as follows :—Whole number of votes, 185 ; for Jonathan Slade, 2d, 93 ; all others, 92 ; necessary to a choice, 93 ; and Jonathan Slade, 2d, having that number, was chosen.

The committee, therefore, report, that Jonathan Slade, 2d, was duly chosen a member of this house from the town of Somerset, at the meeting above referred to, and that the petitioners have leave to withdraw."

This report was printed by order of the house, and on the tenth of April was agreed to.[1]

[1] 71 J. H. 597.

## 1850.

### COMMITTEE ON ELECTIONS.

Messrs. *James Dinsmoor*, of Lowell, *Samuel E. Guild*, of Boston, *Asa H. Waters*, of Millbury, *Charles Marsh*, of Adams, *Charles B. Hall*, of Haverhill, *Joseph P. Johnson*, of Provincetown, *Azariah Shove*, of Fall River.